**Douglas J. HRDINA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–82C.**

United States Claims Court.

March 30, 1984.

Paul A. Kiefer, Washington, D.C., attorney of record, for plaintiff. Kiefer & Morrison, Washington, D.C., of counsel.

Robert G. Giertz, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

WIESE, Judge:

This case is before the court on cross-motions for summary judgment. At issue is a determination of the Secretary of the Air Force, entered pursuant to the recommendation of a formal Physical Evaluation Board (PEB or the Board), finding plaintiff fit for active duty at the time of his mandatory separation from military service. Plaintiff attacks this determination as arbitrary and capricious. The court is asked to void the Secretary's action and, instead, to order that plaintiff's name be placed on the Permanent Disability Retired List and that he be granted disability retired pay retroactive to the date of his discharge. In the alternative, plaintiff asks either that his name be placed on the Temporary Disability Retired List or that the case be remanded to the Air Force (either to the PEB or to the Air Force Board for the Correction of Military Records) to correct what plaintiff characterizes as deficiencies in the administrative record. The Government contends that substantial evidence supports the Secretary's action, and therefore moves for dismissal of the complaint. For the reasons discussed below, the court grants defendant's motion for summary judgment. Accordingly, plaintiff's cross-motion is denied.

## FACTS

Plaintiff was called to active duty on April 7, 1966, entering the Air Force as a

second lieutenant. He served on active duty for 15 years, attaining the rank of captain. On June 22, 1981, he was discharged because he had twice been passed over for promotion to major.

Plaintiff was in good health until late 1967, when he began to notice the gradual onset of an involuntary shaking and drawing of his head to the left. These symptoms first appeared while he was serving in a so-called Human Reliability Program [1] on Johnston Island. Upon his return from that assignment, in March of 1968, plaintiff sought medical advice at the Vandenberg Air Force Base Hospital. There he was evaluated by both the psychiatric service and the Flight Surgeon's office. He was diagnosed as suffering from "torticollis psychogenic in origin." Although the condition was considered serious enough to warrant a recommendation that he be disqualified from the Human Reliability Program, the examining physician did not feel that a change in either plaintiff's physical or psychological profile was also required.

Torticollis, as the administrative record defines it, is "an involuntary movement disorder of the dystonia variety [that is, an abnormal tensing of the neck muscles] thought to be due to a problem in the basal ganglia." Physically, the disease manifests itself in a twisting of the neck resulting in an unnatural position of the head. According to a neurology consultation reported in plaintiff's medical records, torticollis "is clinically differentiated from a tic * * * [in] that a tic is ordinarily a voluntary movement which is subconsciously designed to relieve anxiety." By contrast, in plaintiff's case the disorder appears to heighten his anxiety rather than to relieve it.

On the recommendation of an Air Force psychiatrist, plaintiff participated in group therapy for a short time, but did not find this program beneficial. Thereafter, he entered treatment with a private psychiatrist, whom he continued to see for two years. In the months following the initial diagnosis, plaintiff's condition showed marked improvement. On September 18, 1968, the Air Force Psychiatric Clinic noted that the patient was doing well and recommended full requalification, *i.e.,* restoration to the Human Reliability Program. Indeed, from January to May of 1969 plaintiff served another tour of duty in the reliability program at Johnston Island.

As far as the administrative record shows, plaintiff did not again seek treatment (at least from any Air Force medical facility) for his torticollis condition until April 19, 1980 when he was referred to the Mental Health Clinic at Nellis AFB. During the intervening period, his symptoms were never totally absent; rather—according to his testimony at the administrative hearing—they waxed and waned. Nevertheless, plaintiff's Officer Effectiveness Reports (OER's) indicate that his superiors were satisfied, and frequently impressed, with the manner in which he performed his duties. From January of 1968 to September 15, 1979, plaintiff's OER's consistently display "Above Standard" ratings.

After September 1979, however, plaintiff's situation began to deteriorate. According to his testimony before the PEB, the symptoms of his torticollis increasingly interfered with his job performance. An OER rendered in March 1980 was highly critical of his performance, characterizing it as "substandard".

Sometime in mid-October 1980 plaintiff learned that he had been passed over for promotion to major for a second time, and hence would either have to resign or be involuntarily separated from the service. Then, on October 31, 1980, the administrative record shows that plaintiff consulted the Mental Health Clinic on an emergency basis. The psychiatrist who treated him at that time described plaintiff as being severely depressed by the news of his non-se-

---

1. Neither the administrative record nor the briefs of counsel explain the term "Human Reliability Program". The court assumes that the term refers to a continuous health monitoring program designed to insure the maintenance of qualifying physical and mental standards among service personnel assigned strategic duties.

lection. On December 18, 1980, on his psychiatrist's recommendation, plaintiff was air-evacuated from Nellis AFB to David Grant USAF Medical Center, Travis AFB, California.

Plaintiff's hospital records indicate that he was admitted to David Grant for routine Medical Evaluation Board (MEB) processing. The Medical Evaluation Board is the first step in the process by which the Air Force (as well as the other Armed Services) determines whether a member should be retired as unfit due to a physical disability.

Plaintiff remained hospitalized from December 18, 1980 to March 4, 1981. Early in his hospitalization, plaintiff's neck spasms occurred as frequently as every 5 to 10 minutes throughout the day. Evaluations by both psychiatry and neurology services confirmed the earlier diagnosis of spasmodic torticollis; psychiatry additionally diagnosed an adjustment disorder with work inhibition.[2] Nevertheless, both consulting specialities concluded that plaintiff was qualified for worldwide duty and neither recommended a profile change.

While in the hospital, plaintiff benefited from relaxation therapy and bio-feedback training. His condition improved to the point where both his spasms and the accompanying anxiety had been brought under control. The MEB, which reviewed plaintiff's case on February 19, 1981, endorsed the earlier diagnosis of spasmodic torticollis with adjustment disorder, but noted that the torticollis had "improved with treatment." The MEB recommended that plaintiff's records be forwarded to the Physical Evaluation Board. The PEB is an administrative body which investigates the origin, nature, and permanence of a service member's medical condition and makes findings and recommendations as to disposition of the case.

An informal PEB reviewed plaintiff's records on February 26, 1981, concluding

that plaintiff was not unfit and, therefore, should be returned to duty. Plaintiff exercised his right to demand a hearing before a formal PEB. The formal PEB convened on April 27, 1981. Plaintiff appeared personally and testified before the Board. He was represented by counsel.

The PEB found that plaintiff suffered from "[s]pasmodic torticollis * * * associated with adjustment disorder", but concluded that his condition was "[n]ot unfitting singly or in the aggregate." The Board recommended that plaintiff be returned to duty. Plaintiff formally noted his disagreement with the PEB's findings and submitted evidence in rebuttal.

On May 26, 1981, the Secretary of the Air Force, acting through the Physical Review Council, concurred with the findings of the PEB. Plaintiff was notified of that disposition on June 8, 1981 and informed that he would be returned to duty. He was involuntarily discharged on June 11, 1981. Suit was brought in this court on February 22, 1982.

### Discussion

The Secretary's determination holding plaintiff physically fit for continued military duty is challenged here on three grounds. First, it is alleged that the determination violated administrative standards which require that fitness be evaluated in terms of the constraints placed upon worldwide assignability by a member's physical defects, his ability to perform and the service's obligation to protect the member's health. Second, the determination is alleged to be arbitrary and capricious and, again, contrary to regulation, in that the judgment of fitness failed to accord proper weight to the expert medical opinions of both Air Force and civilian physicians. Third, it is argued that the determination, because it failed to enumerate detailed

---

**2.** The Diagnostic and Statistical Manual of the American Psychiatric Association (Third Edition) defines an adjustment disorder as "a maladaptive reaction to an identifiable psychosocial stressor that occurs within three months after the onset of the stressor." The adjustment dis-

order with work inhibition is primarily manifested as "an inhibition in work or academic functioning occurring in an individual whose previous work or academic performance has been adequate. * * * Examples include inability to study and to write papers or reports."

findings, was too conclusory to be accorded the usual deference due such administrative determinations. The court finds each of these arguments unconvincing.

Taking first the contention that the determination violated the criteria for fitness specified by law, the regulation which sets out those criteria, Air Force Regulation (AFR) 35–4 (September 1980) (titled "Physical Evaluation For Retention, Retirement, And Separation"), provides, in relevant part, as follows:

> Members are unfit when they are clearly unable to perform the duties of their office and grade in such a manner as to reasonably fulfill the purpose of their employment on active duty. * * * [A] member is unfit for worldwide service when that member is not physically able to serve anywhere there may be an Air Force need for his or her services. * * * The mere presence, however, of one or more physical defects or conditions does not in itself justify a finding of unfit. In each case, the combined effect of all physical defects and conditions must be considered in terms of their effect on the member's performance of duty and from the Air Force responsibility to maintain and protect the member during future duty assignments. [AFR 35–4 ¶ 3–33c.]

■ As plaintiff reads it, the quoted regulation—specifically the admonition to maintain and protect its members' health—would prohibit the Air Force from assigning a member to a duty station where his or her health would be adversely affected. In plaintiff's case, several of the physicians and a psychologist who treated him concluded that his condition was exacerbated by stressful working conditions. From this, plaintiff reasons that the Air Force would be precluded from assigning him overseas duty in a combat zone, for example, because such an assignment would expose him to a stress provoking environment. This line of reasoning leads plaintiff to conclude that he is unfit for worldwide service by definition, since he is not able to serve "anywhere there may be an Air

Force need for his * * * services." The final step in plaintiff's argument is that his unsuitability for assignment worldwide necessarily requires that he be found unfit for retention on active duty, under the terms of the regulation.

Whether plaintiff is right in maintaining that the regulation makes fitness for retention synonymous with fitness for worldwide service is a point that need not be decided. Rather, it fully answers plaintiff's argument to say that, even if that reading of the regulation were correct, nothing in its text supports the further step which the success of his argument requires: that worldwide assignability necessarily implies unlimited occupational assignability as well.

And clearly it does not. The concern of the particular language upon which plaintiff relies is with the geographic constraints a member's physical defects may prompt—not with duty constraints. The regulation itself makes this point plain for the text previously quoted goes on to say that "[f]acts such as a duty restriction, which may limit the military occupations of a member will not in itself justify a finding of unfit." In short, if plaintiff is right in saying that a finding of fitness is synonymous with a finding of worldwide assignability, neither yet demands assignability to a combat role. To put it another way, there is nothing in the record to say that the Air Force's need for the worldwide assignability of its members and plaintiff's need to avoid stress-inducing assignments are irreconcilable concerns.

■ There is yet another argument which plaintiff draws from the same text. Here, the focus is upon the word "future" in the regulation's mandate to the Air Force to "maintain and protect the member during future duty assignments." According to plaintiff's argument, the Air Force's obligation to care for its service members encompasses a duty to consider the likely future course of a member's physical condition. Based upon this reading of the regulation, plaintiff argues that even if the PEB had properly found that, as of the day he

appeared before it, he was reasonably capable of performing some useful function in the Air Force commensurate with his rank, nevertheless the Board should have returned a finding of unfit because it was substantially certain from the record that his condition would eventually deteriorate to a point where he could no longer so perform. Factually, the argument relies upon evidence provided by plaintiff's civilian expert, Dr. Harold Stevens, who had written that "gradual progression" of plaintiff's condition could be expected, and that his symptoms "would * * * [interfere] with his proper performance of duty, particularly in a crisis."

Once again plaintiff has read more into the regulation's text than its words actually permit. The Air Force's obligation to protect the health of its members is not—as plaintiff would have it—a flat command directing that a finding of unfitness be entered today because of a medically predictable state of impaired health tomorrow. Rather, as the introduction to AFR 35-4 explains, the purpose of the disability laws (and, hence, of the immediate regulation as well) is "to remove members from active service who can no longer perform the duties of their office and grade". AFR 35-4 ¶ 1-1. The focus is upon a *present* ability to perform; in that context, then, the Air Force's responsibility to consider a member's health in future duty assignments speaks to an obligation to avoid those assignments which unnecessarily threaten the health of a member whose physical defects would not otherwise preclude him from reasonably (and safely) fulfilling the purposes of his employment on active duty. It is only when this last stated objective can no longer be realized that concerns of future assignability would require a judgment of unfitness.

■ As the Government rightly points out, a member is not restricted in the number of times he may appear before the MEB or PEB. Therefore a finding that the member is fit today would not preclude a determination that he is unfit a year from now. Unfortunately, in plaintiff's case, his required discharge because of non-selection for promotion prevented reassessment of his disability status at a later date. But this fact, though it may represent a hardship to plaintiff and others similarly situated, cannot change the result. The fact that plaintiff might become disabled or unfit at some future time cannot be the basis for holding that either the PEB or the Secretary acted outside the scope of the regulations requiring the Air Force to safeguard its members' health.

■ Plaintiff's second major argument—that the Secretary's decision failed to accord appropriate weight to the medical evidence of record—focuses primarily upon the observations of Dr. Harold N. Ginsberg noted in the narrative summary of plaintiff's 1980–81 hospitalization at David Grant USAF Medical Center. Dr. Ginsberg, the psychiatrist who treated plaintiff during that time, wrote, "It seems clear that this condition has caused this patient considerable anxiety and could be considered as a major contributing factor to decreased work ability". Plaintiff also relies upon the opinion of Dr. Harold Stevens, referred to above, which stated that his symptoms "would interfere * * * with his proper performance of duty".

These medical observations, says plaintiff, serve to explain the less-than-favorable OER that he received in March of 1980. And where such a cause and effect relationship between physical defect and diminished job performance has been demonstrated, it is his view that a determination of unfitness is mandated by law. The regulation relied upon, AFR 35-4 ¶ 3-33g, makes the point that determinations of fitness require evaluation of all relevant evidence. Hence, it cautions that poor performance of duty by itself may not be considered as conclusive evidence of physical unfitness "unless there is a clear-cut cause-effect relationship between the two factors."

Accepting plaintiff's reading of the intention of the regulation—that a determination of unfitness *must* follow where poor performance has been prompted by a physi-

cal defect—still no reversal of the Secretary's determination would be in order. What defeats plaintiff's argument is the fact that the OER he relies on, while not good, is still not so bad as to support an unfitness for duty determination.

In the OER in question, plaintiff's performance was rated "Below Standard" in only one category out of ten—"Job Knowledge". In the other nine categories, plaintiff was rated "Standard" in six, "Above Standard" in one, and "Well Above Standard" in two categories. Moreover, in his comments, the rating officer attributed plaintiff's shortcomings to his limited background and training in operational test and evaluation of weapons systems—a field in which plaintiff had never worked before. Health problems were never mentioned.

Similarly telling is the fact that, during the thirteen years of military service preceding the OER in question—years during which, plaintiff testified, his symptoms were never totally absent—he nevertheless served without marked impairment of performance. Thus, the evidence, taken as a whole, falls far short of establishing a clear-cut relationship between poor performance of duty and plaintiff's physical condition. Therefore, neither the PEB nor the Secretary was arbitrary and capricious in failing to give conclusive weight to that evidence.

■ Plaintiff's final argument is that the Secretary's decision, because it is conclusory and does not contain a full discussion of the reasons for its finding of fitness, is inadequate for the purposes of judicial review and should therefore be remanded for further administrative action.

The argument draws upon the results reached in *Istivan v. United States*, 231 Ct.Cl. 671, 689 F.2d 1034 (1982), a case in which the court found unsupportable as a matter of law the decision of the Army Board for the Correction of Military Records (the Correction Board) denying an application for an increase in disability rat-

ing. The administrative action in question before the Correction Board was a summary finding, entered by a Physical Evaluation Board, establishing a 10 percent disability rating based upon its conclusion (the PEB's) that the member's disabling physical condition—regional enteritis—had stabilized. Relief was denied by the Correction Board on the ground that the PEB action showed no material error or injustice.

In considering the issue, the court noted that the evidence upon which the PEB had based its conclusion appeared to be precisely the same as that which, just six weeks earlier, had led an examining physician and a medical evaluation board to a contrary conclusion, *i.e.*, that the member's condition warranted a higher disability rating precisely because the condition had *not* stabilized. Consequently, in the face of an evidentiary record which offered no new evidence and which in the main supported the member's position, the PEB's abrupt change of result fell short of satisfying the minimum explanatory requirements specified in the applicable regulation.[3] The PEB's action, therefore, was merely a conclusion without evaluative content.

Thus, for the Correction Board to have affirmed the PEB's actions without any further explanations of its reasons for doing so, simply compounded the error. This absence of any discernible rationale prompted the court to say that "[i]f judicial review in the military retirement area is to have any meaning at all, an administrative determination based upon a mere statement of conclusions, where conflicting evidence is substantial [meaning the conflicting medical conclusions], cannot be accorded the requisite finality." *Id.* at ——, 689 F.2d at 1038. The matter was therefore remanded to the Correction Board with instructions to identify the facts upon which the PEB had relied and, in turn, to provide the factual and legal basis for its own decision.

In its broadest formulation then, *Istivan* stands for the proposition that judicial re-

---

**3.** The regulation cited by the court, Army Regulation (AR) 635–40 ¶ 7–20b required the PEB to

explain findings affecting a change in disability status and rating.

view cannot operate where an administrative decision purports to resolve, without explanation, the conflict between two diametrically opposed conclusions drawn from the same set of operative facts. Such a decision is but a naked preference—an abuse of authority—rather than a reasoned result.

Nothing of that sort is involved in this case. The evidence bearing upon plaintiff's disease is not ambiguous nor disputed: the record reveals an intractable neurological disorder which, though at times painful, did not render him incapable of performing his duties "in such a manner as to reasonably fulfill the purpose of [his] employment on active duty." AFR 35–4 ¶ 3–33c. Such is the sum and substance of the evidence. A remand for clarification would be an empty exercise.

Nor is there room here for an order directing plaintiff's placement on the Temporary Disability List. Such an action requires, as a condition precedent, a finding that the member is unfit. And that, of course, is the very point which the evidence does not bear out.

Evidence pertaining to his condition in the post-discharge period does not support a different result. That evidence, whose admission the court allowed here as a supplement to the record (over Government objection), is relevant only insofar as it helps to confirm a fact which, but for the Government's own argument to the contrary, was never a point in doubt, namely, that plaintiff's disease was physically rather than mentally rooted.[4] But, insofar as that evidence shows a deterioration in his condition, it is irrelevant here. Fitness considerations, as has been said, focus upon a member's ability to perform at the time his physical condition is being evaluated.

Similarly, of little significance is the fact that the Veterans Administration granted plaintiff a 40 percent disability rating retroactive to the date of his discharge. The cases explain that "VA disability ratings are made under different statutes and for different purposes than are the armed services' determinations of unfitness for duty." *Bennett v. United States,* 200 Ct.Cl. 635, 644 (1973); *de Cicco v. United States,* 230 Ct.Cl. 224, 231, 677 F.2d 66, 71 (1982).

## CONCLUSION

For the reasons given, the court finds the Secretary's decision to be neither arbitrary, capricious, unsupported by substantial evidence nor erroneous as a matter of law. Accordingly, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The petition shall be dismissed.

---

[4.] Among the arguments which the Government presented was the contention that plaintiff's condition was psychosomatic in origin and therefore not within the definition of a "disease or injury" which could properly be the basis of an unfitness determination. This contention has but the scantest support in the record. Aside from a 1967 opinion that plaintiff's torticollis was "psychogenic in origin", all the medical evidence clearly portrays that disease as a neurological disorder. It is also undisputed that plaintiff additionally suffered (and may still suffer) from a psychological reaction which his psychiatrists identified as an adjustment disorder. The medical evidence indicates that these are distinct, although—in plaintiff's case—related disorders. Moreover, it is clear that the PEB viewed them as separate illnesses, in view of its conclusion that plaintiff's torticollis and his adjustment disorder were "[n]ot unfitting *singly* or in the aggregate" (emphasis added).